## LYNCH v. UNITED STATES.
### No. 237, Docket 19688.

Circuit Court of Appeals, Second Circuit.

July 22, 1947.

Nelson D. Spiro, of New York City (Lawrence E. Goldman, of Kansas City, Mo., of counsel), for appellant.

John F. X. McGohey, U. S. Atty., of New York City (John F. Ryan, Asst. U. S. Atty., of New York City, of counsel), for defendant-appellee.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, as administratrix of the estate of her deceased husband, and in her own right as the beneficiary named in the policy, brought this suit in the District Court for the Southern District of New York against the United States to recover on a War Risk Insurance Policy. The policy had been issued to Edward H. Lynch, a member of the armed forces of the United States during World War I and, after lapsing, it had been reinstated on April 1, 1923, and converted into a twenty payment life contract. Under it the insured was entitled to be paid designated amounts monthly if he became totally and permanently disabled while the policy was in force, and his wife, as beneficiary, was entitled to receive the commuted value of any such payments, up to two hundred and forty, which remained unpaid at his death.

Premiums which kept the policy in force through the month of December 1925 were paid and none thereafter. It was stipulated that up to June 26, 1926 extended insurance in the amount of $9,598.66 was in effect. The insured, on June 24, 1936 filed a claim under the policy for total and permanent disability payments based upon his contention that the policy had matured on or about May 1, 1925 for the reason that he had then become totally and permanently disabled within the meaning of its provisions. This claim was denied. The insured died in 1940 and the appellant brought this suit on March 9, 1943.

At the trial by jury in the district court the contested issue was whether the insured had become totally and permanently disabled, as the plaintiff claimed, before the

policy lapsed for non-payment of premiums. The defendant moved for a directed verdict on the evidence and decision on that motion was reserved. The court then submitted the case to the jury which after several hours of deliberation was unable to agree and was discharged. The defendant's motion for a directed verdict was granted and judgment for the defendant was entered. This appeal is from that judgment.

The sole question now before us is whether, upon all the evidence as to the particular circumstances in the case, viewed in the light most favorable to the plaintiff, there was proof of the insured's condition, more substantial than the proverbial scintilla, which would have supported a plaintiff's verdict. Lumbra v. United States, 290 U. S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

There was undisputed evidence to show that the insured was admitted as a patient on April 28, 1925, at the Perry Point Veteran's Hospital, at Perry Point, Md., as an emergency case after he had become so agitated that he could not be restrained while he and his father were attending the horse races at Harve de Grace, Md. He was discharged therefrom on November 20, 1925 at the request of relatives and while he was on parole from the hospital. When he had appeared before the staff at that hospital the diagnosis of the majority was: "Dementia Precox Catatonic, Incompetent. Permanent Total Rating Recommended."

There was evidence from which a jury could have found the following facts. After this discharge he lived with his wife and one child, a son born on December 22, 1923, in an upstairs apartment in the same house in New York City in which his father's family lived in a downstairs apartment. He much resented his father's part in his commitment to the hospital for the insane and at times became so angry and excited that he assaulted his father, though for the greater part of the time the two men got along well. The insured helped his father in his business of a bookmaker at race tracks and for a time engaged in that sort of thing on his own account being at times successful, but on the whole unsuccessful. A second son was born Feb. 2, 1929. His treatment of his wife and children was at times harsh and abusive and he assaulted not only his father but his sisters and his mother as well. From the time he was discharged from the hospital he was restless at night and for years insisted upon taking a pistol with him when he went to bed. He always had some weapon with him when in bed, sometimes an iron rod wrapped with paper and rubber bands, until 1936 when he and his wife separated. Following his return home from the hospital in 1925 he would, at times, get up after he went to bed at night, and with his pistol or other weapon insist upon searching his own apartment and his father's until his delusion that robbers were there could be dispelled by his wife. He often suspected strangers of having designs upon his life and one night burned in the grate all of his wife's clothes which he could find, even tearing off her nightgown and burning that up. For days he would insist upon eating nothing but bread and water and sometimes would not eat at all until his wife had tasted the food and convinced him that it was not poisoned. At one time he went to his sister's home in Hempstead, N. Y., when she and her husband, her mother and another sister were in bed and woke them up by knocking on the door. When this sister opened the door he was standing there with a revolver in his belt and said, "Duck the lights. We are surrounded." They disarmed him after er a local doctor had supplied some quieting medicine.

There were other occurrences of similar character during the period from his discharge from the hospital to his death and there was evidence to show irrational action by him before he was admitted to the hospital. In May 1936 he was admitted as an emergency patient at the New York Central Islip State Hospital. The diagnosis there was "psycho-neurosis; anxiety state." His condition improved and he was released on parole in about three weeks.

In addition to these findings as to his mental condition the jury could have found on conflicting but substantial evidence that the insured had not worked continuously for about a year before he was admitted to the Perry Point Hospital though he had during that time assisted his father and did

so off and on after his discharge. Aside from such work and what he did as a book-maker for himself he did no work during the remainder of his life except as a press boy on the New York Journal American where he worked part time, one or two days a week, from September 1936 until April 1937 and earned on the average a little over ten dollars a week.

While it is true that there was evidence to show that the insured's ability to work and his working time and earning capacity was greater than as indicated by the above, none of such evidence presented more than the usual problems that are the result of conflicting testimony which, in a jury trial, it is the jury's duty to solve if it can. And if one jury cannot agree, a plaintiff, upon such a showing as this is entitled to another jury trial to determine whether the insured was totally and permanently disabled within the meaning of the policy as that phrase in it has been construed. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945; Halliday v. United States, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711. Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458, is so different on the facts that we do not regard it as controlling.

Judgment reversed and cause remanded by a new trial.