## Verna PLANT *v.* Carl PLANT

CA 80-297                                            609 S.W. 2d 93
Court of Appeals of Arkansas
Opinion delivered December 10, 1980

*Steve W. Elledge*, for appellant.

*Macom, Moorhead, Green & Henry*, by:*J. W. Green, Jr.*, for appellee.

STEELE HAYS, Judge. This suit was originated by Carl Plant to confirm his ownership of 67 shares of stock in Arkansas Land & Timber Company, Inc. Title to the shares was in his son, Max Plant, who died on November 11, 1977. Carl Plant had possession of the stock certificate representing the shares. Carl Plant asserts that he transferred the shares to his son on August 26, 1977, delivered the stock certificate to him

and his son immediately returned the certificate to his father, but failed to endorse the certificate through an oversight. Named as defendants were Verna Plant, widow of Max Plant and executrix of his estate, who claimed ownership of the stock by gift *inter vivos*, the corporation and its president and secretary, Mr. & Mrs. Ellis Throckmorton.

The trial court found that no gift *inter vivos* of the 67 shares was intended by Carl Plant on August 26, 1977, when the certificate was issued, as it was not intended that the transfer of the stock be made without the right of recall. Verna Plant appeals on a number of points, the only one we need treat is the assertion that the finding of the trial court that no gift *inter vivos* was intended by Carl Plant is against the preponderance of the evidence.

Rule 52 (ARCP) provides that the findings of fact of the trial court will be affirmed unless clearly erroneous (clearly against the preponderance of the evidence). We have come to the conclusion that the evidence of a valid, irrevocable gift by Carl Plant to Max Plant on February 13, 1976, is clear and convincing, sufficient to meet the requirements of the law, and the trial court erred in failing to so find.

The facts are not greatly disputed: prior to February 13, 1976, Carl Plant decided to transfer his ownership of 335 shares of stock in Arkansas Land & Timber Company, Inc., to his sons, Max and Carl D. His reasons were his advancing years, poor health and the tax advantages of divesting his estate of this asset. His own testimony and that of Carl D. Plant bear witness to these purposes and no other. Carl Plant instructed Mr. Ellis Throckmorton of his desire to transfer the shares and gave him no qualifying instructions. Carl Plant's original certificate was surrendered and two new stock certificates were issued on February 13, 1976, 168 shares going to Carl D. Plant and 167 shares to Max Plant. The actual, manual delivery of these stock certificates was carried out in Clarendon on February 13, 1976, at the home of Max and Verna Plant. Appellee's brief makes the unsupported statement that the stock certificate was "at all times in the possession of Carl Plant." But the testimony of Carl D. Plant clearly shows that the certificate was delivered to his brother at the

February meeting and that either he or Max placed the certificates in a bank lock box to which all three Plants had independent access. Just when the certificate of Max Plant was removed is not disclosed, but prior to August 26, 1977, Carl Plant elected to sue the corporation and it was decided that 100 shares from Max would be transferred back to Carl Plant. The three men then made a trip to the office of the company's lawyer in Jacksonville, Arkansas, where the certificate was voided and two new ones issued in its place: certificate number nine for 67 shares to Max Plant and a certificate for 100 shares to Carl Plant. Presumably, the oversight regarding endorsement by Max Plant occurred at this meeting on August 26, 1977, though that is not made clear in the testimony.

On November 11, 1977, Max Plant died of a terminal illness and on the day of his burial or soon after, Verna Plant received a check payable to Max Plant for $301 as a dividend on the 67 shares. Not certain what to do with the check, she took it to Carl Plant, who said, according to her testimony, that he would see that it was returned to her, which statement he did not refute. On January 9, 1978, Mr. Carl Plant endorsed the name of Max Plant by Carl Plant and received payment of the check. Thus, the dispute over ownership of the 67 shares arose and Carl Plant filed suit in November of 1978 to confirm his claim of ownership. The case law of gifts in Arkansas is copious. Both sides cite *Bowling* v. *Gibson*, 266 Ark. 310, 584 S.W. 2d 14 (1979), as a recent and definitive expression of the law on the subject:

> To constitute a valid gift *inter vivos* there must be an actual delivery of the subject matter of the gift to the donee with a clear intent to make an immediate, unconditional and final gift beyond recall, accompanied by an unconditional release by the donor of all future dominion and control over the property so delivered. All of the elements of the completed *inter vivos* gift must be proved by clear and convincing evidence.

To begin with, there can be no real question but that in determining whether a gift was made the pertinent and significant event occurred on February 13, 1976, rather than

on August 26, 1977, as the trial court found. Just how this misconception developed is not clear, but it is clear that the complaint, the judgment and the bulk of appellee's evidence treat the August 26, 1977, transfer as if that were the crucial transaction in determining whether a gift had been made. Obviously, it is the earlier date that governs and the testimony of both Carl Plant and Carl D. Plant show intent and delivery. Carl Plant's present intent to make a gift is best summarized in his own testimony: Q: "If you had died first, did you intend for that stock to go to Max?" A: "Well, I suppose so, at that moment and at that time, yes." (T. 14)

The law is settled that a gift operates in the present and once made becomes irrevocable. In *Hopson* v. *Buford*, 225 Ark. 482, 283 S.W. 2d 337 (1955), it was said:

We have held in the case of *Williams* v. *Smith*, 66 Ark. 299, 50 S.W. 513, that, "If the gift be intended *in presenti*, and be accompanied with such delivery as the nature of the property will admit, and the circumstances and situation of the parties render reasonably possible, it operates at once, and, as between the parties, becomes irrevocable."

When the circumstances surrounding the transaction of February 13, 1976, are examined in their entirety, we are convinced that Carl Plant intended to do the very thing he did, i.e., to transfer ownership of his shares of stock to his two sons as equally as numerically possible. The law places considerable emphasis upon the formalities of a transfer of shares of stock by the execution of a stock certificate and when, as here, the records of the corporation as to ownership on the instruction of the owner are properly followed, the original certificate submitted and voided, new certificates are issued in the name of the donee and then manually delivered into the possession of the donee, there can be no real doubt but that a gift in accordance with law is intended.

It is said that a man is bound by his acts [*Williams* v. *Smith*, 66 Ark. 299, 50 S.W. 513 (1899)] and the acts as well as the testimony of Carl Plant speak clearly that he intended to do something for his sons during his lifetime and his asser-

tions that it was always understood that the stock was to remain his are lacking in weight and plausibility. The utterances have all the appearance of afterthought, influenced no doubt by the fact that his son, Max, predeceased him and his own health improved.

Carl Plant contends that the certificate to the 67 shares remained in the name of Max Plant through oversight, but that argument is not convincing. It is implausible that Carl Plant and Max Plant would have made a trip to Jacksonville to arrange for the issuance of new certificates — one to Max for 67 shares and one to Carl for 100 shares — if they actually intended all 167 shares to belong to Carl Plant. Carl Plant's claim to the 67 shares relies on this theory as the explanation of his possession of the certificate, but the testimony of both Carl Plant and Carl D. Plant is devoid of any description of this alleged occurrence. What was done with the certificate itself after August 26, 1977, is not clear, but the fair inference is that it was kept in a lock box to which all three men had unrestricted access.

It is argued that Carl Plant was entitled to receive any proceeds of the stock, bringing the case within the rationale of *Bowling* v. *Gibson, supra*. We agree that this is one circumstance to be considered; however, it is not controlling, but simply to be considered along with other circumstances. *Miller* v. *Reigler*, 243 Ark. 251, 419 S.W. 2d 599 (1967), for example. The point is not persuasive in this case, as the only dividend check issued (except for the one interpleaded) was made out to Max Plant, mailed to his address, and plainly belonged to his estate. Thus, the circumstances here are not those of *Bowling* v. *Gibson*. The fact that Verna Plant asked Carl Plant what to do with the check and gave it to him attests to nothing so much as her uncertainty as to what to do with the check. Besides, the records of the company showed Max Plant to be the owner without restriction and Mr. Throckmorton testified that so far as the corporation records were concerned Max was the owner.

It is also argued that Max Plant never attempted to sell the stock thereby giving weight to the argument that his father had the right to recall the stock and, too, that the

August 26, 1977, transfer of the 100 shares bears out that understanding. We attach no particular significance to the fact that Max did not attempt to sell the stock. Certainly, he had every legal right to sell the stock had he elected to do so and the purchaser's title would be unassailable. The second point is of more concern, in the light of repeated assertions that Carl Plant always had the power to recall the stock. But the testimony on this point lacks weight and substance. It is essentially the conclusory utterances of Carl Plant and Carl D. Plant and we believe the law requires more than general assertions, some years after the event itself, in order to set aside the formal acts of conveyance. Examined on the whole, we think the evidence proves that when Max Plant returned the 100 shares as requested by his father, he was simply responding to a filial duty rather than a legal duty, not uncommon in many families.

We are not unmindful of the testimony of Carl D. Plant that Max Plant acknowledged in the presence of Verna, Mr. Throckmorton and others at the February meeting that his father might need help in his old age, saying, "We don't get anything from it till such time as Daddy dies." But Verna Plant and Mr. Throckmorton heard no such statement. However, even if Carl D. Plant's memory was perfect, even if he was free of any bias on behalf of his father, and Max spoke the exact words testified to, this is not the sort of evidence, we think, as should be permitted to override and nullify the steps necessary to a complete and lawful conveyance of stock, as was done. If that were so, then one could make a gift of stock in accordance with all the requirements of the law, complete the delivery to the donee, and years later invalidate it simply by an oral assertion that he intended to retain the power to recall. That is not the law and surely ought not to be.

We find that the case law dealing with gifts of stock reflects a solemn emphasis on the formal execution of documents which are the subject of a gift, especially when followed by delivery of the certificate itself. Such transfer of all the indicia of ownership, i.e., both the formal title and the manual possession of the certificate itself, should not be readily disregarded. In *Johnson* v. *Johnson*, 115 Ark. 416, 171 S.W. 475 (1914), in considering a gift of stock, the Supreme

Court stated that since the stock was transferred on the records of the company and appeared in the name of the donee, the burden was on the appellant to prove that the stock was not the property of the donee.

Similarly, in *Owens* v. *Sun Oil Company*, 482 F. 2d 564 (C.C.A.-10th Circuit), applying the substantive law of Arkansas, it was held that where the donor directed a transfer of ownership of corporate stock for the purposes of a gift to a donee who died before completion of delivery, the fact that the donee's name was on the certificate was *prima facia* evidence of his ownership.

In *Aycock* v. *Bottoms*, 201 Ark. 104, 144 S.W. 2d 43 (1940), an attempt was made to subject various assets, including stock, to a trust for the benefit of heirs of a decedent, the shares being held in the name of the widow. The court rejected the argument that delivery of the stock was not proven, essential to a gift, stating that the assignment to a donee by a holder is tantamount to delivery of the stock, though manual delivery may be wanting.

In *Allan-West Commission Company* v. *Grumbles*, 192 Fed. 287, it was said that even the transfer of the certificate alone is generally sufficient to transfer ownership of stock to a donee. See *Miller* v. *Reigler, supra*.

When the circumstances here presented are examined and reflected on in their entirety, we are satisfied beyond a reasonable doubt that Carl Plant intended to make a gift during his lifetime to his sons for tax purposes and for the satisfactions intrinsic in such acts, and he did all the things necessary to make a legal transfer of stock, followed by delivery of the certificate. In so doing, he performed an irrevocable gift. The evidence that such transfer carried the right of recall is uncertain at best and, therefore, we conclude that the findings of the trial court are clearly erroneous. The case is reversed and remanded for entry of a decree consistent with this opinion.

Reversed and remanded.

PENIX and NEWBERN, JJ., dissent.

MARIAN F. PENIX, Judge, dissenting. I do not find the Chancellor's decision to be clearly against the preponderance of the evidence. The Chancellor, as the fact finder, had the opportunity to observe the witnesses, assess their credibility and determine the truthfulness of their testimony. Carl D. Plant, brother to the deceased, testified:

Q. How come that sixty-seven (67) shares of stock was in the name of C. Max Plant?

A. The stock had been put over half (1/2) in my brother and half (1/2) in my name. We had some litigation and in order for my daddy to bring this litigation in his name, it was necessary that part of the stock be put back to him, so it was decided, because my brother was ill, they would take part of his and cut it down from a 100 to the sixty-seven (67).

Q. Did your brother ever acknowledge that your father was the owner of the stock?

A. One day my brother calls in his wife and my wife and me, Mr. Throckmorton was there, everybody but my daddy, and he said, 'now girls you see this, our daddy is doing this possibly for tax purposes and he wants to give us something in his lifetime, but y'all understand we don't get anything from it until such time as daddy dies, cause he's going to need to take care of himself in his old age.' (Mr. Throckmorton is an official with the Arkansas Timber and Land Company, Inc.)

. . . .

Q. Now when the 100 shares was transferred back to your father on August 26, 1977, and the 67 shares represented by stock certificate number Nine (9) retained by your brother, was there any argument on the part of your brother about transferring that back to your father?

A. No argument at all it was thoroughly understood that later on it would come back to him.

. . . .

THE COURT: Do you know why the stock was transferred to you and your brother in 1976?

CARL D. PLANT: My father felt like he wanted to do something for my brother and I, and had the pleasure of knowing that we were going to get something, he said 'Now I'm going to transfer this to you, also we might be able to do something with the inheritance tax,' and so the understanding arrangement was entered into by all that it was to be done this way as long as my father lived for four or five years he would use up the rest of his Estate, it's less than $100,000.00, and then that was all to take care of him and didn't feel like it was to be disbursed . . . .

In the recent case of *Larry Boling, Special Administrator* v. *Merna W. Gibson and Cecil L. Gibson*, 266 Ark. 310, 287 S.W. 2d 14, the Supreme Court held that there must be an actual delivery of the subject matter of the gift to the donee with a clear intent to make an immediate, unconditional and final gift beyond recall, accompanied by an unconditional release by the donor of all future dominion and control over the property so delivered, in order to constitute a valid gift inter vivos.

The elements required to complete an inter vivos gift must be shown by clear and convincing evidence. The gift must be beyond recall. The gift must be accompanied by an unconditional release by the donor of all future dominion in control over the property so delivered. These are factual determinations to be made by the fact finder — in this instance the Chancellor. The Chancellor found ". . . that it was never intended by Plaintiff, Carl Plant, to transfer beyond recall the 67 shares of stock represented by stock certificate number 9 to C. Max Plant on the 26th day of August, 1977, and said transfer did not constitute an inter vivos gift."

I do not agree with the majority that the Chancellor's findings of fact are clearly erroneous.

I would affirm the Chancellor; therefore, I respectfully dissent.

NEWBERN, J. joins in this dissent.